26278. MAY *v.* SMITH, executrix.

DECIDED DECEMBER 4, 1937.

*Albert E. Mayer,* for plaintiff in error.
*James A. Branch, Thomas B. Branch Jr.,* contra.

MACINTYRE, J. Mrs. E. C. Smith as executrix of the will of her husband, W. B. Smith, sued Harry May on the following instrument: "Atlanta, Georgia, Feb. 2, 1933. Due W. B. Smith $500, balance due on sale of diamond ring. This amount bears interest from date at 6% per annum. Harry May." This instrument was on the printed stationery of Harry May, and was typewritten, including the apparent signature of "Harry May" at the end thereof. The defenses were not indebted and non est factum. After the introduction of evidence by both parties, the judge of the municipal court of Atlanta rendered judgment in favor of the plaintiff for $500 principal, and $115.50 interest to date. The exception is to the judgment overruling the defendant's motion for new trial containing the general and seven special grounds. In each of the special grounds error is assigned because the court ruled out certain evidence of Harry May upon the ground that it "was an attempt to go into a transaction between the defendant and a person now deceased in a suit brought by the representative of the deceased person." Taking the special grounds in order, the evidence rejected was substantially as follows: (1) May never wrote the due-bill on the typewriter. (2) May never authorized any one to sign his name to promissory notes. (3) May first heard of the due-bill after the death of W. B. Smith. (4) May never authorized Joe Goldberg, his trusted employee and bookkeeper, to sign the due-bill. (5) "We have all of our transac-

tions with Mr. W. B. Smith on our loan book. Most of our transactions were through loans to Mr. Smith. If I had owed Mr. Smith any note, it would have been on the ledger, bills payable or notes payable." (6) Joe Goldberg never had authority to sign May's name to any paper. (7) May never knew who wrote the due-bill.

Under the Code, § 38-1603, par. 1, "Where any suit shall be instituted or defended by . . the personal representative of a deceased person, the opposite party shall not be admitted to testify in his own favor against the . . deceased person as to transactions or communications with such . . deceased person, whether such transactions or communications were had by such ·. . deceased person with the party testifying or with any other person." The inhibition applies to testimony tending either directly or indirectly to show the execution or non-execution of the due-bill. *Webb* v. *Simmons*, 3 *Ga. App.* 639 (60 S. E. 334), and cit.; *Chambers* v. *Wesley*, 113 *Ga.* 343 (38 S. E. 848); *Neely* v. *Carter*, 96 *Ga.* 197, 201, 202 (23 S. E. 313); *Jewell* v. *Walker*, 109 *Ga.* 241 (6), 246 (34 S. E. 337); *Hudson* v. *Hudson*, 98 *Ga.* 147 (3) (26 S. E. 482); *Carroll* v. *Elliott*, 176 *Ga.* 415 (136 S. E. 236). Under the foregoing authorities, the court properly rejected the evidence in question. Furthermore, it appears from the brief of evidence that Harry May testified, in effect, that he never heard of the due-bill, or saw it, until after the death of W. B. Smith, and never authorized any one to sign it for him; also that Joe Goldberg gave substantially the same evidence referred to in the fifth assignment of error.

We come next to the general grounds of the motion for new trial. Mrs. E. C. Smith, testified, in part, as follows: "Mr. Smith died October 27, 1934. This conversation was a short time before that . . Mr. Smith was taken violently ill on September the 6th, and it was after that time. He had gotten up, and we were walking in front of the Winecoff Hotel. We met Mr. May with his sister and her husband, . . and Mr. Smith said to me in Mr. May's presence . . : 'Earl, don't forget Harry May has not paid you that $500 he owes you for your ring;' and Mr. May answered, smiling at me . . : 'That is just like W. B.; you can't have five minutes social conversation without introducing business . . we will take care of that, won't we?'

And I smiled and said, ' Yes.' . . Mr. May did not deny owing Mr. Smith the $500 for the ring. He said, 'We will take care of that.' . . We found in his [W. B. Smith's] safety-deposit box this due-bill . . on the letter-head of Harry May, for $500. We did not find any other paper or memorandum or book entry, or any mention of any sort as to any debt between Mr. Smith and Mr. May from that date to the time Mr. Smith died. . . I know the ring referred to in the conversation was the ring referred to in the paper. . . I know it was the ring." Miss Kathleen Hobby testified, in part: "I worked for Mr. W. B. Smith for about fifteen years . . I was his secretary. . . I kept his books. . . Once or twice I heard Mr. Smith ask Mr. May when he was going to give him the money, or something of the kind. . . I first saw the paper [due-bill] about the time it is dated. Shortly after Mr. Smith made this statement, he left the office and came back within an hour and exhibited this paper to me. . . On September 28, 1934, I took this paper to Mr. May's store. He [Smith] sent me over there to get another ring, and with this due-bill. I got the ring, but not the money. I showed Mr. May this due-bill. I don't know that he looked at it. . . I had it in my hand and exhibited it to him. Mr. May said: 'Tell W. B. that is all right. I will fix that up all right.' Mr. May did not deny that he had signed the due-bill. . . Mr. Smith told me to get this $500 and the diamond ring, and I went over and asked Mr. May for $500. He said to tell W. B. not to worry about that. I don't mean to say that I opened up this due-bill and shoved it in Mr. May's face. . . As to whether I am sure and would swear that I showed that paper to Mr. May—I had it, and he knew what I was talking about. I couldn't swear that he looked at it, and I don't know whether he saw it. . . At the time I told Mr. May that Mr. Smith wanted to be paid for the ring, I think the Claughton ring had been paid for. . . I took the typewritten paper over there, and had it in my hand, and opened it up, but whether he saw it or not I don't know. . . . Referring to this typewritten paper, I said I went to see Mr. May and wanted a certain diamond ring with three stones in it. I said Mr. Smith sent me over to get the ring. And I think I said Mr. Smith sent me over to get this. . . I held the paper out. I don't know whether I held it in front of him or not. You

know how you hold a paper, and I said, 'Mr. Smith sent me over to get this money and the diamond ring,' and I described the ring. I spoke to Mr. May and exhibited this paper. At the time I said, 'Mr. Smith sent me over to get this money.' He said: 'Tell W. B. not to worry about that.' At the time I unfolded it, Mr. May was three or four feet from me. I can not say that Mr. May saw or read what was on the paper. I couldn't swear that Mr. May even knew that the paper I showed him is this . . due-bill. . . I thought he did. . . Whether he read it then or not I don't know. By his acknowledgment I thought that he did know what it was, because he said: 'Tell W. B. I will fix it up.' . . Mr. May had opportunity to read that paper, but I don't know that he did."

There was testimony which strongly tended to support the plea of non est factum. Without more, however, we will state that, since the credibility of witnesses and the interpretation of their testimony is for the jury or the court acting as a jury, we feel constrained to sustain the judgment of the trial court.

*Judgment affirmed. Broyles, C. J., concurs.*

GUERRY, J., concurring specially. I concur dubitante, for the reason that the extrinsic proof of an acknowledgment of the due-bill by the defendant is so very slight that its admissibility in evidence is doubtful.