## 68108, 68109. EXECUTIVE AUTO LEASING, INC.
## v. GUARANTY NATIONAL INSURANCE
## COMPANY; and vice versa.

BIRDSONG, Judge.

Insurance claim. Executive Auto Leasing, Inc. was a business which bought and then leased automobiles either to individuals or as fleet leases. From February through October, 1979, Executive purchased approximately one hundred forty 1979 Chevrolet Impala automobiles. Executive leased these cars to London Taxi which operated a taxi service in the metropolitan area of Atlanta. Executive billed London monthly for the vehicles leased to London. In July 1979, London defaulted in its lease payments to Executive. Officers and employees of Executive came to Atlanta from Maryland to investigate the reason for the default and arrange a more satisfactory payment schedule. By September 1979, it became apparent that London Taxi was a failing business; therefore, its creditors petitioned it into Chapter 11 bankruptcy. The trustee in bankruptcy took control of London Taxi's assets. The trustee required London Taxi to make daily payments by check for the leased vehicles. London also had to provide insurance for the use and operation of the 140 vehicles in its control. That insurance was obtained by London effective October 26, 1979, from Guaranty National Insurance Company. The loss payee was Executive.

After London Taxi was petitioned into bankruptcy on September 1, 1979, a supervisor from Executive came to Atlanta to inventory its assets leased to London Taxi and to collect the daily payments. The inventory was conducted between the end of September and the middle of October 1979. All 140 vehicles apparently were located at that time, though some were in body shops for repairs. At the time of the inventory the actual mileage of the vehicles, or in some cases to the nearest hundred or thousand, was obtained.

From October 1979, through February 1980, a group known as the Metro Taxicab Group received a list of vehicles being operated by London Taxi. This list purported to be a list of vehicles to be insured by the Metro Taxicab Group, a self insurer. It was acknowledged by the manager of the Metro Taxicab Group that all the vehicles were never seen or accounted for by the insurer and that several vehicles were known to be missing. Nevertheless, London Taxi paid a premium for all 140 vehicles both to Metro Taxicab Group and Guaranty National.

On April 1, 1980, the trustee in bankruptcy caused the bankruptcy court to close down London Taxi finally and completely. The president of Executive was notified and flew to Atlanta that same day. All drivers for London Taxi were directed to return the cabs to

the lot. By the evening of April 1 when the president of Executive arrived at the lot, there were approximately 30 vehicles on the lot. Before the end of that first day, five more vehicles were returned. When the trustee was informed of the missing vehicles, he caused the local police and federal marshals to be called into service. By April 8, a week after the closure of the business, Executive had located 91 of the cars; by April 10, 101 cars; by May 12, 123 cars; by May 29, 130 cars.

As of June 18, Executive filed claims for ten vehicles, seven allegedly stolen and three totally damaged but found in body repair shops. One of the damage claims was satisfactorily concluded before trial and two of the missing seven were recovered. Guaranty National had been informed of the closure of London Taxi as a business in early April and had been kept informed by Executive of the steady progress in recovering vehicles. On April 19, Guaranty National cancelled its coverage, as authorized by the policy. Ultimately, Executive furnished loss reports to Guaranty National on June 26. Guaranty National apparently satisfied itself that further efforts to locate the remaining missing cars might be unproductive and initiated its own investigation on August 7, 1980.

The evidence adduced at trial makes it manifestly clear that Executive was wholly unaware of the time when the two vehicles claimed as damaged might have been damaged, who was driving (if indeed the damage resulted from a moving accident), or under what circumstances the damage occurred. The loss reports merely reflected "damaged vehicles, circumstances unknown." As to the missing vehicles, Executive reported the vehicles to have been "stolen" on April 1, 1980. This conclusion was reached because after Executive commenced the recovery of its fleet in April and continued those efforts through June, five cars were missing and never returned. However, it is clear also that it is known neither when the cars disappeared, whether they were damaged cars that were never located, nor in what manner they became missing.

Executive sought to recover the value of the five missing cars plus the value of the two totalled cars less salvage. After a jury trial disclosing the above facts, Guaranty National moved for a directed verdict. This was denied and the case submitted to the jury. The jury returned a verdict of $15,000 for the five missing cars and $4,993 for the two damaged cars. Upon motion by Guaranty National for a judgment notwithstanding the verdict, the trial court granted the motion concluding that Executive had not shown its loss to be within the terms of the insurance coverage nor incurred during the period of coverage. Executive brings its appeal to the ruling. Guaranty National brings a cross-appeal enumerating as error certain alleged improper evidence relating to damages. *Held*:

The contract of insurance between London Taxi (and its successor, Executive) and Guaranty National provided that Guaranty National, in consideration of an appropriate premium, promised to pay for theft or collision damage, mischief, or vandalism occurring to any of the insured vehicles. The policy required the insured London (or Executive) promptly to notify the insurer of any accident or loss, including the date, time and circumstances of any such loss. This was to be accomplished by a proof of loss. In the event of stolen vehicles, the insured was promptly to notify police. Loss coverage existed only for losses occurring during the policy period, i.e., during the period from October 26, 1979, to April 19, 1980. Absence of proof of a loss during the period of coverage precluded recovery under the policy. *Culwell v. Lomas & Nettleton Co.*, 148 Ga. App. 478, 479 (251 SE2d 579).

Guaranty National contended from the inception of its involvement in this dispute that Executive had never shown a "theft" of any vehicle. Even assuming without deciding coverage for certain types of "mysterious disappearances," a type of loss not mentioned in the policy, the evidence offered by Executive does not establish the date, time, or circumstances of the "mysterious" losses. Even though Executive notified Guaranty National that as of April 1, 1980, when Executive regained actual possession of its automobiles, it was "missing" over 100 vehicles, Executive posited that it anticipated recovering most if not all of the vehicles. Indeed over the next two months, all but five of the vehicles were accounted for by recovery. Executive did not file a claim of loss until June 1980, and Guaranty National did not recognize a potential loss until August when it commenced an investigation of the five missing vehicles. There is no showing that Executive or the bankruptcy trustee believed over 100 vehicles had been stolen as of April 1 simply because that number of vehicles had not been returned to the lot. The services of police and federal marshals were sought to assist in the search, location, and return of all 140 vehicles leased to London Taxi. We cannot construe this evidence as constituting a "theft" of cars occurring on April 1 simply because the vehicles were not present on the lot as of April 1, as contended by Executive. Likewise, there is no showing when the five cars first became missing or when the two damaged cars received damages. As early as October 1979, there was evidence that some cars were "missing" either because they were under repairs or were not accounted for on the lot. The latest date showing the probability of the presence of all vehicles was at least two weeks prior to the effective date of assumption of coverage by Guaranty National.

Under these facts the trial court concluded as a matter of law that Executive had not established a "theft" of the five missing vehicles; nor had it shown that the missing vehicles were taken or that damages to the two on hand occurred during the policy period. We

are constrained to agree with the conclusions of the trial court.

The policy of appellate courts is to enforce strictly an insurance contract in accordance with its unambiguous terms, even in those instances where the court's sympathy may avowedly rest with an unfortunate claimant where recovery is precluded by that strictness of policy. *State Farm Mut. Auto. Ins. Co. v. Sewell*, 223 Ga. 31, 32 (153 SE2d 432); *Boyes v. Continental Ins. Co.*, 139 Ga. App. 609, 610 (229 SE2d 75). Though "mysterious disappearance" might be considered under appropriate circumstances to be a theft, each of the cases cited by Executive indicated a vehicle present at a given place at a given time missing without the consent and sometimes without knowledge of the owner, which are factual circumstances wholly different to the case now considered. See *Lewis v. American Road Ins. Co.*, 119 Ga. App. 507 (167 SE2d 729). See also *Sentry Ins. Co. v. Henderson*, 138 Ga. App. 495 (226 SE2d 759).

The general rule in construing contracts is that words are to be given their usual and ordinary meaning, unless the context requires a different construction. *Benefield v. Malone*, 112 Ga. App. 408, 410 (145 SE2d 732). As we view this policy, the coverage was for "theft" and not for an unexplained, mysterious disappearance, thus there is no apparent or legal reason to justify an interpretation of "theft" as something other than a taking with a larcenous intent. We are satisfied that Executive has not shown a "theft" of its vehicles as required by the policy. See *Hartford Fire Ins. Co. v. Wimbish*, 12 Ga. App. 712, 714 (78 SE 265). See also *Gunn v. Globe &c. Ins. Co.*, 24 Ga. App. 615, 616 (101 SE 691). Moreover, when or whether the damage to the two autos was caused by fire, collision, vandalism or mischief is not shown. Indeed no facts concerning the circumstances of either the loss or damage is reflected in this record of trial.

A motion for directed verdict is in order where there is no conflict in the evidence and a verdict in movant's behalf is demanded. A motion for judgment notwithstanding the verdict likewise may be granted where a valid motion for directed verdict erroneously has been denied. *Daniel v. Weeks*, 217 Ga. 388 (1) (122 SE2d 564). Under the circumstances of this case, we find no error in the grant of judgment to Guaranty National notwithstanding the jury verdict to Executive.

That part of Executive's appeal dealing with the write-off of part of the monetary judgment based upon deductibles for each car is rendered moot by the decision that there was a total lack of coverage. Likewise, Guaranty National's cross-appeal based upon the admissibility of certain evidence relating solely to damages is rendered moot.

*Judgment affirmed. Quillian, P. J., concurs. Carley, J., concurs in the judgment only.*

Decided May 9, 1984.

*Oscar N. Persons, Steven W. Smith, J. Scott Jacobson,* for appellant.
*Rex D. Smith,* for appellee.