72787. GULF LIFE INSURANCE COMPANY v. BROWN et al.
(351 SE2d 267)

BENHAM, Judge.

On October 20, 1983, Gulf Life Insurance Company ("Gulf Life") issued a life insurance policy covering Benny R. Brown, his wife, and their children, as well as future additions to the family. At that time, the Browns had two children and were expecting a third. On May 3, 1984, after a 39-week gestation period, Mrs. Brown gave birth to a stillborn baby, Dustin Chad Brown, whose death resulted from intrauterine fetal asphyxiation. The Browns filed a claim with Gulf Life, seeking death benefits of $10,000 under the policy, but coverage was denied based on the stillborn birth. The Browns filed suit, and Gulf Life answered and moved for summary judgment, contending that the stillborn child was not a "person" covered under the policy. The trial court denied Gulf Life's motion for summary judgment, and this interlocutory appeal followed.

As far as we can determine, the issue presented here is one of first impression: Does a life insurance policy which covers after-acquired dependents but which does not define the term "person" cover a stillborn child? The insurance policy in question provides benefits for dependent children and defines them as follows: "(a) natural child; (b) step-child; or (c) legally adopted child. The child must depend primarily upon you for support and maintenance. The child must be unmarried and not have reached his/her 19th birthday at issue."

We will begin with a discussion of the history of prenatal injuries and death, not because the history is necessarily determinative, but because it sheds light on the subject. The debate over when life begins is almost as old as life itself. But, for legal purposes, the discussion must begin with *Dietrich v. Inhabitants of Northampton*, 138 Mass. 14 (1884), which concerned a wrongful death action for an unborn child. In denying relief, *Dietrich* stated that an unborn child was still part of the mother. The issue was considered again in *Allaire v. St. Luke's Hosp.*, 184 Ill. 359 (56 NE 638) (1900). While *Allaire* followed the ruling in *Dietrich*, a noteworthy dissent registered by Justice Boggs stated that a fetus should be recognized when it becomes viable and capable of existing separately from its mother. In another wrongful death action in 1949 for the loss of a fetus, Minnesota in *Verkennes v. Carniea*, 229 Minn. 365 (38 NW2d 838) (1949), recognized a right of action for the loss of a viable fetus. Cases allowing

actions following *Verkennes* did so by recognizing a viable fetus as a "person" or "in life." Action for Death of Unborn Child, 15 ALR3d 992, 993. There can be no real discussion of injuries and death without mentioning the seminal case of *Bonbrest v. Kotz*, 65 FSupp. 138 (D.C. 1946). *Bonbrest* was a medical malpractice case wherein the infant-plaintiff sought recovery for prenatal injuries sustained during delivery. In allowing recovery, *Bonbrest* represented a sharp break with the past by recognizing a right of recovery after the fetus attained viability.

It is interesting to note that Georgia entered the controversy of when life begins early on in the significant decision of *Powell v. Augusta &c. R. Co.*, 77 Ga. 192 (3 SE 757) (1887). While not allowing an action for the death of an unborn fetus, *Powell* did recognize a cause of action for injuries due to a miscarriage, thereby placing some importance on the life of a fetus. Admittedly, *Powell* and succeeding cases looked more to the damage done to the mother by the loss than to any damage done to the fetus. However, such an approach adds strength to appellee's argument here because benefits under a life insurance policy are designed to compensate the survivors and not the deceased.

Over the years, the issues of fetal injury and fetal death have been considered, in a criminal context, in numerous cases, such as *Sullivan v. State*, 121 Ga. 183 (48 SE 949) (1904). There the court interpreted the word "child" in the Penal Code to mean "an unborn child so far developed as to be ordinarily quick, so far developed as to move or stir in the mother's womb . . . *Rex v. Phillips*, 3 Campbell [73, 77 (170 Eng. Rep. 1310) (1811)]." Id. at 187. Cf. also *Summerlin v. State*, 150 Ga. 173 (103 SE 461) (1920). The most significant of these earlier discussions took place in *Tucker v. Howard Carmichael & Sons*, 208 Ga. 201 (65 SE2d 909) (1951). There, a cause of action was allowed on behalf of a child who suffered a prenatal, but not fatal, injury at the hands of a negligent party carrying its mother to a hospital. *Tucker*, quoting from Blackstone, Book I, page 130, of Blackstone's Commentaries on the Laws of England, stated: "The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation. Life is the immediate gift of God, a right inherent by nature in every individual; and it begins in contemplation of law as soon as an infant is able to stir in the mother's womb . . . An infant in ventre sa mere, or in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a legacy, or a surrender of a copyhold estate, made to it. It may have a guardian assigned to it; and it is enabled to have an estate limited to its use, and to take afterwards by such limitation, as if it were then actually born. And in this point the civil law agrees with ours." Id. at 203. *Tucker* is signifi-

cant in that it represents for the first time a recognition by the courts of Georgia of the rights of a prenatal fetus separate and apart from its mother.

*Tucker* was quickly followed by *Porter v. Lassiter*, 91 Ga. App. 712 (87 SE2d 100) (1955), which allowed a lawsuit on behalf of a child who was injured after having become quick in the womb; and *Hornbuckle v. Plantation Pipe Line Co.*, 212 Ga. 504 (93 SE2d 727) (1956), which held that "[i]f a child born after an injury sustained *at any period of its prenatal life* can prove the effect on it of a tort, it would have a right to recover." Id. at 504. (Emphasis supplied.) The latest word on prenatal injuries by Georgia courts came in *McAuley v. Wills*, 251 Ga. 3 (5) (303 SE2d 258) (1983), where the Georgia Supreme Court, after mentioning a long list of law review articles, including "Note, The Law and the Unborn Child: The Legal and Logical Inconsistencies," 46 Notre Dame Lawyer, 349 (1971), recognized the right to recover for prenatal injury by stating "[t]o the extent that the trial court ruled that a person owes no duty of care toward an unconceived child . . . [cases] show that, at least in some situations, a person should be under a duty of care toward an unconceived child." Unquestionably, Georgia cases show a clear tendency toward placing a high premium on human life and an unmistakable willingness to recognize a fetus as a person at a time prior to actual delivery.

There can be no real and meaningful discussion of the issues of prenatal injuries, prenatal death, and what constitutes a "person" without consideration of the United States Supreme Court's landmark decision in *Roe v. Wade*, 410 U. S. 113 (93 SC 705, 35 LE2d 147) (1973). While *Roe v. Wade* declared certain abortion statutes unconstitutional as being overly broad and vague and violative of the Fourteenth Amendment, it also touched on the issue of what constitutes a "person" for Fourteenth Amendment purposes. The State argued unsuccessfully that a fetus is a person and that it was therefore a violation of the Fourteenth Amendment to prevent the State from regulating abortions to protect life. *Roe* spoke to the issue: "The Constitution does not define 'person' in so many words . . . But in nearly all these instances [where 'person' is mentioned in the Constitution], the use of the word is such that it has application only postnatally . . . All this, together with our observation, . . . persuades us that the word 'person,' as used in the Fourteenth Amendment, does not include the unborn." Id. at 179.

If we were considering a Fourteenth Amendment question — which we are not — our discussion would end here, and we would reverse the trial court's denial of summary judgment to *Gulf Life*. However, the discussion of what constitutes a "person" for Fourteenth Amendment purposes may be different from what constitutes a "person" for insurance purposes, as evidenced by the U. S. Su-

preme Court's statement in *Roe v. Wade*: "We need not resolve the difficult question of when life begins. When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer." Id. at 181.

Our extensive discussion of the historical development of the law of prenatal injuries and death, while not dispositive of the issue, does illuminate vital portions of the question as to what constitutes a "person." Appellant argues forcefully for a "born alive" approach to a definition of a "person" under the policy. The allure of this argument is obvious: it is simple, concise, and to the point. Unfortunately, allure alone is not enough, for this definition does not take into consideration that some religious groups consider a person to exist at conception; that under the common law, quickening in the womb is the cut-off point; and that even as recently as *Brinkley v. State*, 253 Ga. 541, 543 (322 SE2d 49) (1984), the Supreme Court, after tracing the development of the law, defined a child as meaning "an unborn child so far developed as to be ordinarily quick, so far developed as to move or stir in the mother's womb . . ." The lower court's superb opinion recognized these diverse views on the issue, and in an attempt to bring reason and common sense to bear, acknowledged that there is little agreement as to what constitutes a "person" and denied the motion for summary judgment.

We find the language of *Travelers Indem. Co. v. Whalley Constr. Co.*, 160 Ga. App. 438 (287 SE2d 226) (1981), very helpful in resolving the issues here: "The insurer in preparing its policy has the burden of using language that is clear and precise." Id. at 440. Also instructive is the language at 441: "Any exclusion sought to be invoked by the insurer . . . will be liberally construed in favor of the insured and strictly construed against the insurer unless same is clear and unequivocal." See also OCGA § 13-2-2 (5): "If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred."

We are mindful that we have been called upon only to consider whether the trial court erred in denying Gulf Life's motion for summary judgment. Being limited in that fashion, we must, on appellate review of summary judgment proceedings, construe all evidence and ambiguities most favorably toward the respondent and against the movant. *Blount v. Seckinger Realty Co.*, 167 Ga. App. 778, 779 (307 SE2d 683). In applying the principles of contract construction and those pertaining to summary judgment, we find that the trial court did not err in denying Gulf Life's motion for summary judgment.

*Judgment affirmed. Deen, P. J., concurs and also concurs specially. Beasley, J., concurs specially.*

DEEN, Presiding Judge, concurring specially.

While concurring fully with the scholarly analysis by the majority opinion and concurring fully with Judge Beasley's special concurrence, I also concur specially to add and advance one exception to allowing recovery of insurance benefits for the death of an unborn child.

In *Dred Scott v. Sandford*, 19 How. 393 (1857), in deciding that blacks were not citizens or people of the United States and thus were without any individual constitutional rights, the United States Supreme Court, in effect, held that blacks were non-persons. In *Roe v. Wade*, 410 U. S. 113 (93 SC 705, 35 LE2d 147) (1973), the Supreme Court held that unborn children were non-persons under the Constitution and therefore possessed no individual rights. The *Dred Scott* decision was overruled by the affirmative action of armed assault and aggression and the Fourteenth Amendment. Considering the continued controversy concerning the volatile issue of abortion, it might be argued that "the jury is still out" on the viability of the *Roe v. Wade* decision.

Regardless of whether an unborn child should be considered a person under the Constitution, two things are clear in this case: (1) there is no logical obstacle to considering an unborn child a person under an insurance policy; and (2) the insurer could have specifically excluded coverage for unborn or stillborn children, but failed to do so. However, while the trial court properly denied summary judgment for the insurer here, it should be emphasized that public policy would prohibit recovery of insurance benefits for the death of an unborn child brought about by abortion, unless inducing the abortion was medically necessary to preserve the life of the mother. To allow such recovery by voluntary parental induction of abortion would, where the mother's life is not in danger, result in an unjust enrichment and violate a recognized, universal sentiment of justice, i.e., "the principle that no man should profit from his own inequity or take advantage of his own wrong." Cardozo, The Nature of the Judicial Process, 41 (1925). Compare the example of "Hutzpa" in *Williams v. State*, 126 Ga. App. 350 (190 SE2d 785) (1972).

BEASLEY, Judge, concurring specially.

The question is whether the life insurance policy issued to Benny R. Brown as the insured covers the death of his child, which occurred before birth. The facts are undisputed that the child died on his way to birth and was not born alive.

The question is primarily one of contract construction, and all of those rules which we must apply obtain here.

The insurer agreed to pay death benefits to Benny for the death of a family member upon "due proof of the death of such person."

Eligible family members are his spouse and: "Your dependent children named in the application or acquired later. A dependent child is your: (a) natural child; (b) step-child; or (c) legally adopted child. The child must depend primarily upon you for support and maintenance. The child must be unmarried and not have reached his/her 19th birthday at issue."

The insurer does not dispute the fact that Dustin Chad Brown was a "child" of insured's at the time of his intrauterine death. What it does contest is that he was a *dependent* child, as that term is described in the policy. Although this policy does not expressly exclude stillborn children, which the policy drafters could have stated, that does not automatically include such children. Instead, the matter of dependency is crucial and in this case governs.

The insurer has not conclusively shown that the child did not depend primarily on Benny Brown for support and maintenance, and thus there is a factual issue still to be resolved. However, it is hard to conceive of facts, given the record already established in this case, which would show that the intrauterine child was not primarily dependent on his mother instead, not only for food and shelter and all he needed, but for life itself. It may very well be that additional evidence will conclusively establish that the child never became primarily dependent on his father.

The unambiguous terms of the policy compel this conclusion. *Executive Auto Leasing v. Guaranty Nat. Ins. Co.*, 170 Ga. App. 860, 863 (318 SE2d 733) (1984); *Terrell v. Life Ins. Co. of North America*, 174 Ga. App. 753, 755 (2) (331 SE2d 609) (1985).

I am authorized to state that Presiding Judge Deen joins in this special concurrence.

DECIDED DECEMBER 1, 1986

*C. G. Jester, Jr., Guerry R. Moore*, for appellant.
*Edward Benton, Edward W. Clary*, for appellees.